### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHIONOGI IRELAND, LTD. (f/k/a SCIELE PHARMA IRELAND, LTD.), | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED RESEARCH LABORATORIES, INC., | : | NO.  11-2861 |
| | : | |
| Defendant. | : | |

### MEMORANDUM

BUCKWALTER, S. J.                                                          August 16, 2011

 Plaintiff Shionogi Ireland, Ltd. ("Plaintiff") has filed the present Motion to Dismiss Defendant United Research Laboratories, Inc.'s ("Defendant" or "URL") Counterclaim.  For the following reasons, the Motion is granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL HISTORY

 According to the factual allegations set forth in Defendant's Counterclaim, Plaintiff markets and distributes an FDA-approved drug called Sular.  (Countercl. ¶ 5.)  On August 17, 2009, Plaintiff and Defendant entered into an agreement ("the Agreement") pursuant to which Defendant was granted an exclusive sublicense to market and sell a generic alternative to Sular ("the Product").  (Id. ¶ 6.)[1]  Both Sular and the Product are forms of Nisoldipine, a drug used to treat high blood pressure.  (Id. ¶¶ 5, 22.)  In exchange for distributing the Product, Defendant would receive a 15% commission on the net revenue of the sales.  (Id. ¶¶ 7-9.)  Defendant paid Plaintiff a nominal price, known as the "Transfer Price," for a supply of the Product.  (Id. ¶ 10.)

---

 [1]  At the time the Agreement was made, Plaintiff was known as Sciele Pharma Ireland, Ltd.  (Id.)

According to Defendant, in the event that the Transfer Price exceeded the Net Sell Price of the Product,[2] the Transfer Price would be reduced to an amount equal to the Net Sell Price less 20%. (Id. ¶¶ 10-13.)  This was referred to in the Agreement as "Price Protection."  (Id. ¶ 11.)

After the parties entered into the Agreement, Defendant alleges that Plaintiff engaged in a course of conduct that prevented it from realizing the benefit of its bargain.  First, Defendant contends that even though the Agreement commenced in August of 2009, Plaintiff directed Defendant to delay the launch of the Product until June of 2010.  (Id. ¶ 20.)  Second, during the time period between the signing of the Agreement and the launch of the Product, Plaintiff raised the price of Sular three times, which compelled consumers to seek alternatives to Nisoldipine. (Id. ¶¶ 21-23.)  Third, after Plaintiff launched the Product, it continued to raise the price of Sular while directing Defendant to increase the volume of its orders for the Product.  (Id. ¶¶ 24-25.) Fourth, Plaintiff supplied Sular to certain customers at prices lower than Defendant was charging for the Product.  (Id. ¶¶ 26-29.)  Finally, on March 24, 2011, Defendant exercised its contractual right to terminate the Agreement, and on April 5, 2011 notified Plaintiff that it had a substantial amount of the Product that it was unable to sell.  (Id. ¶¶ 34-35.)  Plaintiff refused to take back the Product, and Defendant has been forced to sell it at prices well below the Transfer Price.  (Id. ¶¶ 36-39.)

On April 28, 2011, Plaintiff filed a Complaint in this Court, alleging that Defendant breached the Agreement when it failed to pay amounts due and owing, to use reasonable

---

[2]  The Net Sell Price is defined as the "gross invoice price reasonably determined by URL for the Products less any rebates or discounts earned by URL's customers against that invoice with the exception of the customer's prompt pay discount."  (Def.'s Resp. Opp'n 18, Ex. 1, Agreement between United Research Laboratories, Inc. and Sciele Pharma Ireland, Ltd. ("Agreement") ¶ 6(B)(c).)

commercial efforts to market, distribute, and sell the Product, and to market and sell the Product in a way that maximized revenue.  (Compl. ¶¶ 10-12, 22.)  Defendant filed its Answer and Counterclaim on May 18, 2011.  The Counterclaim includes three counts: (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; and (iii) declaratory relief, which asks the Court to interpret certain terms of the Agreement.  (Countercl. ¶¶ 40-55.) Plaintiff filed the present Motion to Dismiss Defendant's Counterclaim on June 13, 2011, Defendant filed its Response in Opposition on July 21, 2011, and Plaintiff filed a Reply Brief on August 4, 2011.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  It emphasized that it would not require a "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

In the subsequent case of Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), the Supreme Court enunciated two fundamental principles applicable to a court's review of a motion to dismiss for failure to state a claim.  First, it noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.

3

at 1949.  Thus, although "[Federal] Rule [of Civil Procedure] 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id. at 1950. Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

Notwithstanding the foregoing, nothing in Twombly or Iqbal has altered some of the fundamental underpinnings of the Rule 12(b)(6) standard of review.  Arner v. PGT Trucking, Inc., No. CIV.A.09-0565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); Spence v. Brownsville Area Sch. Dist., No. CIV.A.08-0626, 2008 WL 2779079, at *2 (W.D. Pa. Jul. 15, 2008).  Federal Rule of Civil Procedure 8 requires only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. FED. R. CIV. P. 8; Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

III.    DISCUSSION

    A.    **Breach of Contract**

In Delaware,[3] a plaintiff asserting a breach of contract claim must establish: "(1) the existence of an enforceable contract, whether it be express or implied; (2) a breach of a contractual obligation; and (3) resulting damages." Prusky v. Allstate Life Ins. Co., No. CIV.A.09-05156, 2010 WL 3859787, at *3 (E.D. Pa. Sept. 30, 2010) (citing VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003)).

Here, Defendant claims that Plaintiff breached the Agreement when it: (i) directed Defendant to delay its launch of the Product; (ii) engaged in an aggressive pricing strategy that caused customers to seek Nisoldipine alternatives; (iii) offered prices to Sular customers which "disincentivized those customers" from buying the Product from Defendant; (iv) limited Defendant's period of exclusivity by delaying the launch of the Product; and (v) demanded payment for the Product at a Transfer Price that was higher than the Net Sell Price. (Countercl. ¶¶ 40-43.)  Defendant contends that these actions violated paragraph 9(c) of the Agreement, which states that Plaintiff "'will not, directly or indirectly, enter into any contract or any other transaction with any third party or affiliate that conflicts or derogates from its undertakings in this Agreement.'" (Id. ¶¶ 30, 40-43; Def.'s Resp. Opp'n 18 (quoting Agreement ¶ 9(c)).)

Plaintiff has moved to dismiss the breach of contract Counterclaim in its entirety.  With respect to the first, fourth, and fifth grounds listed above, Plaintiff argues that even if it directed Defendant to delay the launch, limited Defendant's period of exclusivity by this delay, and demanded a Transfer Price that was higher than the Net Sell Price, none of these actions violated paragraph 9(c) of the Agreement.  (Pl.'s Mot. Dismiss 8.)  Rather, that provision only applied in

---

[3]  Both parties acknowledge that the Agreement is governed by Delaware law.  (Pl.'s Mot. Dismiss 5 n.5; Def.'s Resp. Opp'n 2 n.1.)

the event that Plaintiff entered into a contract with a third party or affiliate, and Defendant has

not alleged that the delayed launch or the demand for a high Transfer Price was caused by such a

transaction.  (Id.)  Defendant responds that "the 'third parties' with which [Plaintiff] entered into

agreements (or contracts) that derogated from [Plaintiff's] undertakings are purchasers of

Nisoldipine, i.e., customers [Defendant] targeted or would target for sale of [the Product]."

(Def.'s Resp. Opp'n 20.)

        The Court agrees with Plaintiff for several reasons.  First, Defendant has not pleaded with

particularity how Plaintiff's sale of Sular to third parties caused the delay of the Product's launch

or the demand for a high Transfer Price.  Furthermore, even assuming Plaintiff's sales did cause

the delay, Defendant has failed to identify any language in the Agreement indicating that the

launch of the Product had to commence by a certain date.  Finally, with respect to the Transfer

Price, even if Plaintiff demanded more money than it was entitled to receive, there is no

allegation that Defendant actually paid the money or that Plaintiff withheld subsequent deliveries

of the Product in order to compel Defendant to pay.  As such, Defendant has not alleged any

damages, which are an essential element of a breach of contract claim.[4]

        Next, with respect to Defendant's second and third grounds for breach of contract,

Plaintiff argues that engaging in "an aggressive pricing strategy" and offering prices that caused

certain customers to refrain from purchasing the Product do not constitute conduct prohibited by

the Agreement.  (Pl.'s Mot. Dismiss 9-10.)  According to Plaintiff, the Agreement did not impose

any duty that compelled it to price Sular in a particular way.  (Id. at 9.)  Indeed, the Agreement

---

        [4]  The issue of whether Defendant is entitled to an adjustment of the Transfer Price is a
separate consideration, and is addressed below in the Court's discussion of Defendant's request
for declaratory relief.

specifically stated that Defendant's sublicense to sell the Product was subject to Plaintiff's

"'ability to continue to market, distribute, and sell branded Sular.'"  (Id. (quoting Agreement ¶

2).)  Defendant responds that Plaintiff's pricing activities breached its "obligation not to enter

into agreements that derogate from its undertakings under the Agreement.  The Counterclaims

also allege that [Plaintiff's] pattern of pricing was designed to prevent [Defendant] from

achieving its reasonable expectation of generic sales."  (Def.'s Resp. Opp'n 20 (footnote

omitted).)

      Even if all of Defendant's allegations are true, they do not support a cause of action for

breach of contract.  The Agreement neither restricts the manner in which Plaintiff may market

and price Sular nor guarantees that a particular amount of sales will be enjoyed by Defendant.  If

Plaintiff's activities were unreasonable and prevented Defendant from receiving the benefits of

its bargain, they may support Defendant's claim for breach of good faith, but they do not

constitute a violation of the express terms of the Agreement.  Plaintiff's Motion to Dismiss

Defendant's Counterclaim for breach of contract is therefore granted in its entirety.

      **B.**      **Breach of the Implied Covenant of Good Faith and Fair Dealing**

      The implied covenant of good faith and fair dealing is "best understood as a way of

implying terms in the agreement, whether employed to analyze unanticipated developments or to

fill gaps in the contract's provisions."  Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 441

(Del. 2005) (internal citations and quotations omitted).  The "implied covenant is a judicial

convention designed to protect the spirit of an agreement when, without violating an express

term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the

fruits of the parties' bargain."  Chamison v. HealthTrust, Inc. – The Hosp. Co., 735 A.2d 912,

920 (Del. Ch. 1999) (footnote omitted).  As part of its analysis, a court "must assess the parties'

reasonable expectations at the time of contracting and not rewrite the contract to appease a party

who later wishes to rewrite a contract he now believes to have been a bad deal."  Nemec v.

Shrader, 991 A.2d 1120, 1126 (Del. 2010) (footnote omitted).  Finally, when the conduct at issue

is authorized by the terms of the agreement, the covenant generally does not apply.  Dunlap, 878

A.2d at 441.

　　　　Here, Defendant's Counterclaim for breach of the implied covenant of good faith and fair

dealing is based on allegations similar to those in its cause of action for breach of contract.

Defendant claims that Plaintiff acted in bad faith by: (i) directing Defendant to delay the launch

of the Product; (ii) engaging in an aggressive pricing strategy that compelled customers to seek

Nisoldipine alternatives; (iii) offering prices to certain customers that dissuaded those customers

from purchasing the Product; (iv) limiting Defendant's period of generic exclusivity by delaying

the launch; (v) directing Defendant to increase its inventory of the Product while simultaneously

destroying the market for Nisoldipine; and (vi) demanding a Transfer Price that was higher than

the Net Sell Price.  (Countercl. ¶ 47.)  Plaintiff has moved to dismiss all six of these grounds.

(Pl.'s Mot. Dismiss 10-15.)

　　　　With respect to the first and fourth grounds listed above, Plaintiff argues that Defendant

has failed to allege an implied duty to launch the Product by a certain date, failed to identify the

date that the launch was supposed to occur, and failed to cite the terms of the contract that

support the implied duty.  (Id. at 14.)[5]  Defendant responds that in "common industry practice,

---

[5]  Plaintiff also argues that Defendant's Counterclaim for breach of good faith is barred by
its own expressly reserved right to market and sell Sular.  (Pl.'s Mot. Dismiss 14.)  The Court
rejects this argument.  Plaintiff's ability to control the distribution of its own product is different

the brand company typically controls the date of launch for its authorized generic to begin

distribution." (Def.'s Resp. Opp'n 26.)  As such, when Plaintiff unreasonably delayed the launch

of the Product, it prevented Defendant from realizing the benefits of its bargain. (Id.)  The Court

agrees with Defendant.  The Agreement is silent with respect to the launch date, but it is as least

plausible that the contract implied a good faith duty on Plaintiff to distribute the Product to

Defendant as soon as reasonably possible.  Defendant has alleged that the Agreement

commenced in August of 2009, but that Plaintiff – acting in bad faith – delayed the launch of the

Product until June of 2010. (Countercl. ¶¶ 20, 47.)  The Court finds that this allegation is

sufficient to state a claim.

Plaintiff next moves to dismiss the second, third, and fifth grounds of Defendant's bad

faith claim, which pertain to Plaintiff's pricing of Sular. (Pl.'s Mot. Dismiss 14-15.)  Plaintiff

once again notes that the Agreement was contingent upon Plaintiff's continued ability to market

Sular, and that Defendant was responsible for setting its own prices. (Id. at 14.)  Plaintiff argues

that Defendant has failed to allege that Plaintiff had an implied duty to price Sular in a particular

manner, to disclose to Defendant market research or pricing information regarding Sular, or to

ensure a market for the Product. (Id. at 15.)  Defendant responds that even though the Agreement

states that both parties were responsible for their own pricing, Plaintiff marketed Sular with the

intent to harm Defendant. (Def.'s Resp. Opp'n 26.)  Essentially, Defendant alleges that Plaintiff

charged "monopoly prices" for Sular when there was no competition. (Id. at 30.)  When

Defendant entered the market with the Product, however, Plaintiff decreased the price for

---

from an express contractual right to prevent Defendant from launching the Product, and neither
party has alleged that the Agreement contains the latter.

branded Sular to a rate that was actually lower than the generic.  (Id.)  This was contrary to common industry practice, in which the generic form of a drug is typically priced around 70% to 75% of the branded product.  (Countercl. ¶ 16; Def.'s Resp. Opp'n 26.)  According to Defendant, Plaintiff engaged in this conduct so as to maximize short-term profits at the expense of long-term growth.  (Id. at 28.)

As noted above, the covenant of good faith is violated when, without breaching an express term of the contract, one party uses oppressive tactics to deny the other party the benefit of its bargain.  See Chamison, 735 A.2d at 920.  Therefore, even though the Agreement allowed Plaintiff to continue marketing and distributing Sular, it is plausible that Plaintiff breached its duty of good faith if it priced the drug with the intent of inhibiting Defendant's ability to sell the Product.  The Court therefore finds that Defendant's pricing allegations sufficiently state a claim for breach of the covenant of good faith and fair dealing.

Finally, although Plaintiff has moved to dismiss the breach of good faith Counterclaim in its entirety, it does not address Defendant's claim that Plaintiff breached this duty by demanding a Transfer Price that was higher than the Net Sell Price.  In the absence of any argument by Plaintiff to which it can respond, the Court simply concludes that Defendant's allegation that Plaintiff acted in bad faith by demanding more money than it was entitled to is sufficient to state a claim.  Plaintiff's Motion to Dismiss Defendant's Counterclaim for breach of the implied duty of good faith and fair dealing is therefore denied.

## C.    Declaratory Relief

In Delaware, "[t]he interpretation of a contract is a question of law and, in many cases, is suitable for determination on a motion to dismiss."  Meso Scale Diagnostics, LLC v. Roche

Diagnostics GMBH, No. CIV.A.5589, 2011 WL 1348438, at *8 (Del. Ch. Apr. 8, 2011).  A court

should not, however, "choose between reasonable interpretations of ambiguous contract

provisions when considering a motion to dismiss under Rule 12(b)(6)."  Kahn v. Portnoy, No.

CIV.A.3515, 2008 WL 5197164, at *3 (Del. Ch. Dec. 11, 2008) (citing VLIW Tech., LLC v.

Hewlett-Packard Co., 840 A.2d 606, 615 (Del. 2003)).

      Defendant's final Counterclaim is a request for a declaratory judgment, which asks the

Court to declare the following:

> a.    Under the terms of the Agreement, for product that URL sells below the Transfer
> Price, the Transfer Price is reduced pursuant to Paragraph 5(e), and URL thereby
> would only owe the adjusted Transfer Price, minus the 15% commission, to
> Shionogi; and
>
> b.    Under the terms of the Agreement, for product that URL is unable to sell, the Net
> Sell Price is zero, and the adjusted Transfer Price is therefore zero, and URL
> thereby would owe nothing to Shionogi.

(Countercl. ¶ 55.)  Plaintiff moves to dismiss this request on the grounds that it conflicts with the

actual language of paragraph 5(e), which states as follows:

> In the event the Transfer Price is equal to or greater than the Net Sell Price . . . of the
> Products at the time the Products are delivered and invoiced to URL in accordance with
> Section 5 above, then Sciele shall adjust the Transfer Price to an amount equal to the Net
> Sell Price of the Products less twenty percent (20%) (the "Price Protection").  In such
> event, URL will be entitled to receive Price Protection, within thirty (30) days on: (a)
> URL's inventory on-hand in URL's warehouse; (b) inventory in-transit from Sciele to
> URL that has been invoiced at the higher price; (c) inventory on-hand in URL customers'
> warehouses; and (d) inventory in transit between URL and URL customers' warehouses
> that was invoiced at the previous higher Net Sell Price.

(Agreement ¶ 5(e).)  Plaintiff argues that Defendant has failed to allege that the amounts of the

Product it sold at a rate lower than the Transfer Price were sold "'at the time the Products [were]

delivered and invoiced to [Defendant],'" as required by the Agreement.  (Pl.'s Mot. Dismiss 16-

17 (quoting Agreement ¶ 5(e).)  According to Plaintiff, the Agreement does not "provide that the Transfer Price can be recalculated at the time [Defendant] actually sells or determines that it cannot sell any product that currently has not sold."  (Id. at 17.)  Thus, under Plaintiff's interpretation of paragraph 5(e), Price Protection would only be available for amounts of the Product for which the Net Sell Price had been determined by the time they were delivered to Defendant.  If, after receiving a shipment of the Product, Defendant was unable to sell it at or above the Transfer Price, it was not entitled to Price Protection.

Defendant raises several arguments in response.  First, it contends that the Agreement's Exhibit A – which Plaintiff did not reference in its Motion to Dismiss – provides a basis for its claim that it is entitled to reimbursement.  (Def.'s Resp. Opp'n 6.)  Exhibit A, according to Defendant, shows a simulated schedule in which Defendant's pre-existing inventory is sold at a rate lower than the Transfer Price, and the Transfer Price is subsequently reduced to reflect the Net Sell Price.  (Id. 8-9.)[6]  In addition to the scenario outlined in Exhibit A, Defendant notes that paragraph 5(e) allowed for the retroactive reduction of the Transfer Price on inventory stored in its warehouse and in its customers' warehouses.  (Id. at 10.)  Defendant argues that this contradicts Plaintiff's interpretation of paragraph 5(e).  (Id.)

Defendant also contends that while Plaintiff's construction of paragraph 5(e) has

_____

[6]  Plaintiff argues that "[t]he parol evidence rule bars URL's interpretation of the Exhibit A spreadsheet because URL's interpretation *must* be based on extrinsic evidence that conflicts with the plain language of ¶ 5(e)."  (Pl.'s Reply Br. 10.)  Assuming, without deciding, that Defendant would have to rely exclusively on extrinsic evidence to prove that its interpretation is correct, the Court finds that such evidence would be admissible because paragraph 5(e) is not clear on its face.  See Segovia v. Equities First Holdings, LLC, No. CIV.A.06C-09-149, 2008 WL 2251218, at *19 (Del. Super. Ct. May 30, 2008) (holding that parol evidence may be considered "when necessary to interpret ambiguous terms").

"technical grammatical appeal when read in isolation, it is *not* an accurate statement of the Agreement's meaning when read in its entirety."  (<u>Id.</u> at 13.)  Plaintiff's interpretation "would make a pointless correlation between the date the product was delivered to [Defendant] and the serendipity of a sale taking place on that particular date.  According to [Plaintiff], all Net Sell Prices other than that which happened to occur on the delivery date are irrelevant . . . ."  (<u>Id.</u> at 14-15.)

At this stage of the litigation, the Court lacks sufficient information to determine how the Price Protection arrangement actually operated.  As noted above, Defendant was entitled to Price Protection "[i]n the event the Transfer Price is equal to or greater than the Net Sell Price . . . of the Products at the time the Products are delivered and invoiced to URL."  (Agreement ¶ 5(e).) Significantly, however, neither party has definitively addressed the issue of when the Net Sell Price had to be calculated.  The definition contained in the Agreement merely refers to the Net Sell Price as the "gross invoice price reasonably determined by URL for the Products less any rebates or discounts earned by URL's customers against that invoice with the exception of the customer's prompt pay discount."  (Agreement 6(B)(c).)  Plaintiff argues that "[b]ecause rebates or discounts earned by URL's customers against URL's gross invoice to them can only be determined *after* URL sells the product, the 'Net Sell Price' for a delivery from [Plaintiff] to URL cannot be known 'at the time the Products are delivered and invoiced to URL.'"  (Pl.'s Reply Br. 9-10.)  Therefore, according to Plaintiff, "the 'Net Sell Price' used in ¶ 5(e) must refer to a 'Net Sell Price' previously established 'at the time the Products are delivered and invoiced to [Defendant],' rather than the 'Net Sell Price' later determined for that order."  (<u>Id.</u> at 10.)

Plaintiff's argument suggests that there were either multiple Net Sell Prices, or that the

Net Sell Price was recalculated between the time Defendant ordered the Product and the time Defendant actually sold it.  Unfortunately, the Agreement is not clear about any of this.  Indeed, Plaintiff itself notes that Defendant did *not* have an obligation to provide the Net Sell Price at the time it placed its purchase orders.  (Id. at 10 (citing Agreement ¶ 5(a).)  If the Net Sell Price was calculated after Plaintiff delivered the Product, this would support Defendant's argument that the phrase "at the time the Products are delivered and invoiced" refers to the Transfer Price rather than the Net Sell Price.  (See Def.'s Resp. Opp'n 13.)  In other words, if the Net Sell Price could not be calculated until after Defendant received and sold the Product, then Plaintiff's interpretation of paragraph of 5(e) would be illogical, because it would be impossible to determine "at the time the Products are delivered and invoiced," whether the Net Sell Price was equal to or less than the Transfer Price.  In sum, the Court finds that paragraph 5(e) is not clear on its face, and Plaintiff's Motion to Dismiss Defendant's Counterclaim for a declaratory judgment is denied.[7]

IV.   **CONCLUSION**

For all of the foregoing reasons, the Court finds that Defendant has failed to allege that Plaintiff's activities violated any express term of the Agreement.  Plaintiff's Motion to Dismiss

---

[7] In a footnote, Plaintiff also suggests that the Counterclaim for declaratory relief should be dismissed because "the relief sought is fully subsumed within the context of calculating [Plaintiff's] damages in its breach of contract claim . . . ."  (Pl.'s Mot. Dismiss 16 n.10.)  Defendant responds that even if the Court rules against Plaintiff on its breach of contract claim, it would not necessarily result in a declaration that Defendant has properly construed paragraph 5(e), because Plaintiff's Complaint does not ask for an interpretation of that provision.  (Def.'s Resp. Opp'n 17.)  The Court agrees with Defendant.  It is not clear at this stage of the litigation whether Plaintiff's failure to prevail on its breach of contract claim would automatically establish that Defendant's interpretation of the Agreement was correct.  Plaintiff's Motion to Dismiss Defendant's request for declaratory relief on the grounds that it is duplicative of its own breach of contract claim is therefore denied.

Defendant's Counterclaim for breach of contract is therefore granted.  Next, the Court finds that Defendant has sufficiently alleged that Plaintiff delayed the launch of the generic drug, demanded more money than it was contractually entitled to, and priced its own product, Sular, all with the bad faith intent to deprive Defendant of the benefit of its bargain.  As such, Plaintiff's Motion to Dismiss Defendant's Counterclaim for breach of the implied covenant of good faith and fair dealing is denied.  Finally, because the Agreement is unclear about when the Net Sell Price had to be calculated, the Court finds that a legitimate dispute exists pertaining to the interpretation of paragraph 5(e).  Plaintiff's Motion to Dismiss Defendant's Counterclaim for a declaratory judgment is therefore denied.

An appropriate Order follows.